**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

JANET TRAWICK,
on behalf of Plaintiff and
the class members described below,

                Plaintiff,

    vs.

NETCREDIT LOAN SERVICES, LLC,

                Defendant.

## COMPLAINT  – CLASS ACTION

### INTRODUCTION

1.      Plaintiff Janet Trawick brings this action against NetCredit Loan Services, LLC, to obtain redress from usurious loans arranged by NetCredit Loan Services, LLC.

2.      Plaintiff seeks damages under the Indiana Consumer Credit Code.

### JURISDICTION AND VENUE

3.      The Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d).  There are more than 100 class members.  The amount in controversy, exclusive of interest and costs, exceeds $5 million on a classwide basis.  Plaintiff is a citizen of Indiana. Defendant is a citizen of Illinois and Delaware.

4.      This Court has personal jurisdiction over Defendant because it is located in Illinois.

.    5.      Venue is proper for the same reason.

6.      Article III of the Constitution of the United States is satisfied because actions for statutory damages and invalidation of loans for usury were entertained by the courts of England and the United States in 1787. English Usury Act of 1713, 12 Anne Session 2 c. 17. All thirteen original American states replaced the English usury statutes with their own usury laws between 1641 and 1791. Christopher L. Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92 Minnesota Law Review 1110, 1116-18 (April 2008), summarizing

-1-

statutes allowing 5% to 8% interest.

## PARTIES

7. Plaintiff is a citizen of Indiana and a resident of Indianapolis, Indiana.

8. Defendant NetCredit Loan Services, LLC is a limited liability company organized under Delaware law with a principal address of 175 West Jackson Blvd., Ste. 600, Chicago, IL 60604. Its registered agent and office is C T Corporation System, 208 S. La Salle St., Suite 814, Chicago, IL 60604-1101.

9. The sole manager of Defendant NetCredit Loan Services, LLC is CNU Online Holdings, LLC, of the same address.

10. The sole manager of CNU Online Holdings, LLC is Enova Online Services, Inc., of the same address, a Delaware corporation.

11. The ultimate parent company of the organization is Enova International, Inc., a Delaware corporation with its principal address at 175 West Jackson Blvd., Suite 600, Chicago, Illinois 60604.

## FACTS

12. On or about May 4, 2022, Plaintiff obtained a $2,830 loan arranged by Defendant NetCredit Loan Services, LLC, via the Internet. A copy of the loan agreement is attached as Exhibit A.

13. Plaintiff obtained the loan from www.NetCredit.com, an online lending platform operated by Defendant.

14. Plaintiff obtained the loan for personal, family or household purposes.

15. The loan had an interest rate of 64.75%.

16. This rate is typical of the rates charged by NetCredit Loan Services, LLC to residents of Indiana.

17. All rates charged by NetCredit Loan Services, LLC to residents of Indiana exceed 36% per annum.

-2-

18. The loan was nominally made by Republic Bank & Trust Company, Cincinnati, Ohio.

19. Plaintiff disclosed her Indiana address on the loan application.

20. Plaintiff has paid usurious interest. The loan is still outstanding unpaid as of the filing of this action.

21. The loan agreement (Exhibit A) is written on a standard form.

22. The loan was obtained for personal purposes and not for business purposes.

23. The loan was made entirely via the Internet.

24. The principal amount was transferred to Plaintiff's bank account in Indiana via ACH.

25. The loans were to be repaid via ACH. Plaintiff made some payments. The loan is still outstanding.

26. Plaintiff made some of the payments, including interest. NetCredit is seeking to collect the balance.

27. A significant majority of the transaction occurs within the State of Indiana – applying for the loans and receiving and collecting the funds.

## HOW NETCREDIT LOAN SERVICES, LLC ARRANGES LOANS

28. According to the annual report on SEC Form 10-K filed by Enova International, Inc., the ultimate public parent of NetCredit Loan Services, LLC, for the year ending Dec. 31, 2023 (original pages 2-3), NetCredit Loan Services, LLC engages in a "Bank Program" or "bank partner" program, described as follows:

> Bank programs. Certain subsidiaries operate programs with certain banks ("Bank Programs") to provide marketing services and loan servicing for certain installment loans and line of credit accounts. The Bank Programs that relate to the consumer portfolio include near-prime unsecured installment loans and line of credit accounts for which our subsidiaries receive marketing and servicing fees. The bank has the ability to sell, and the participating subsidiaries have the option, but not the requirement, to purchase the loans or a participating interest in receivables the bank originates. We do not guarantee the performance of the loans and line of credit accounts originated by the bank. The Bank Program that relates to the small business portfolio is with a separate bank and includes installment loans and line of credit accounts. We receive marketing fees while the bank

receives origination fees and certain program fees. The bank has the ability to sell and we have the option, but not the requirement, to purchase the installment loans the bank originates and, in the case of line of credit accounts, extensions under those line of credit accounts. We do not guarantee the performance of the loans or line of credit accounts originated by the bank.

As of December 31, 2023, we operated programs with three separate bank partners. Purchases under these programs represented 28% and 22% of our consolidated originations and purchases for the years ended December 31, 2023 and 2022, respectively. Management does not deem there to be significant reliance on any of our banking partners.

29.     One of the "banking partners" is Republic Bank & Trust Company, 601 W. Market St., Louisville, KY 40202.

### NETCREDIT ENGAGES IN RENT-A-BANK SCHEME WITH REPUBLIC BANK

30.     NetCredit is one of several online lending platforms owned by Enova.

31.     All of Enova's online lending platforms carry high interest rates, with some exceeding 100% annually.

32.     Because almost every state, including Indiana, renders NetCredit's interest rates usurious, it "partners" with Republic Bank.

33.      Purportedly, Republic Bank originates the lines of credit and then assigns accounts to NetCredit, which "services" the accounts.

34.     The arrangement is colloquially known as a "rent-a-bank" scheme.

35.     However, at no point is Republic Bank the true lender of the NetCredit accounts, nor is any capital belonging to Republic Bank at risk.

36.     Such "rent-a-bank" schemes simply allow predatory lenders like NetCredit to make loans to consumers in states which prohibit usury, including Indiana, with a modicum of legal cover. Republic Bank, as a state-chartered bank, can assert pre-emption under federal law to Indiana anti-usury statutes, and it can export the maximum interest rate of its home state of Kentucky to lend to borrowers in other states with  stricter usury laws.

37.     However, Republic Bank is not the true lender of Plaintiff's loan.

38.     Republic Bank had virtually nothing to do with the marketing, underwriting, servicing, and/or collection of the Account, and has engaged in a "rent-a-bank" scheme with

-4-

Defendant.

39.     In "rent-a-bank" schemes, predatory lenders like NetCredit launder their loans under the guise that the loan is made by a bank.

40.     While such "rent-a-bank" schemes have several different variants, they all have several common features:

      a.     The design of the loan product, including the name of the product (e.g., NetCredit) is proposed by a nonbank to the bank;

      b.     The bank outsources all or nearly all activities relating to the loan, including marketing, underwriting, funding, and servicing;

      c.     These services are outsourced to a single nonbank entity (e.g., Enova and its related subsidiaries); and,

      d.     There is a transfer of all or almost all of the credit risk on the loans either to the nonbank and related subsidiaries directly, or to third-party "investors" through transactions arranged by the nonbank.

41.     Essentially, the nonbank and its affiliates initiate the relationship, propose all aspects of the loan process be outsourced to it, provide all or nearly all of the factors necessary to make the loans, and then acquire most of the economic interest in the loans to facilitate the off-loading of those interests to a third party, creating a modest, but guaranteed, profit for the bank on each loan.

42.     Enova – a publicly-traded company on the New York Stock Exchange with a market capitalization of over $1 billion – claims that it "has provided more than 7 million customers with over $40 billion in loans".  Enova July 28, 2022  8-K filing with the Securities and Exchange Commission.

43.     The SEC Form 10-K filed by Enova International, Inc., for the year ending Dec. 31, 2023 states (original page 1) that "We use our proprietary technology, analytics and customer service capabilities to quickly evaluate, underwrite and fund loans or provide financing . . . ."

44.     Enova's 10-K filing further explains that it is Enova's proprietary technology that is used to:

a.      operate websites which customers use to apply for loans;

b.      maintain customer information;

c.      market its loans;

d.      make credit and financing decisions throughout the customer relationship; and,

e.      manage the external interface for funds transfers and provide daily accounting, reconciliation, and reporting functions.

SEC Form 10-K filed by Enova International, Inc., for the year ending Dec. 31, 2023  (original pages 1-7)

45.     Enova states (original page 7):

Our proprietary technology platform is built for scalability and flexibility and is based on proven open source software. The technology platform was designed to be powerful enough to handle the large volumes of data required to evaluate customer applications and flexible enough to capitalize on changing customer preferences, market trends and regulatory changes. The scalability and flexibility of our technology platform allows us to enter new markets and launch new products quickly, typically within three to six months from conception to launch.

We continually employ technological innovations to improve our technology platform, which performs a variety of integrated and core functions, including:

•       Front-end system, which includes external websites, landing pages and mobile sites and applications that customers use when applying for loans and managing their accounts;

•       Back-end and customer relationship management, or CRM, systems, which maintain customer-level data and are used by our call center employees to provide real-time information for all inquiries. Our back-end system and CRM system includes, among other things, our contact management system, operational and marketing management system, automated phone system, Interactive Voice Response and call center performance management system;

•       Decision engine, which rapidly evaluates and makes credit decisions throughout the customer relationship; and

•       Financial system, which manages the external interface for funds transfers and provides daily accounting, reconciliation and reporting functions.

46.     These statements contradict claims made on the NetCredit.com website which claim, in fine print at the bottom, "all NetCredit loans and lines of credit are underwritten by" Republic Bank.

47.     Any underwriting criteria established "by" Republic Bank are simply a rubber-stamp of the criteria established by Enova and its subsidiaries.

48.     Republic Bank's name does not appear a single time in Enova's 8-K and 10-K disclosures.  Presumably, if Republic Bank were the true lender of NetCredit loans, the financial condition of Republic Bank would be of interest to investors in Enova.

49.     The consumer-facing website NetCredit.com also discloses that in some states, such as Delaware, NetCredit loans are "are offered by a member of the NetCredit family of companies."

50.     In other states, like Indiana, the loans are "funded by Republic Bank & Trust Company."

51.     Republic Bank simply receives a guaranteed fee, per loan, for renting its name and status as an FDIC-insured bank to NetCredit.

.      52.     Republic Bank gets paid roughly 5% of the value of the loan as its fee, irrespective of whether the consumer ever repays the loan.

53.     NetCredit indemnifies Republic Bank against any losses and, in a complex series of transactions utilizing several different limited liability companies, money "loaned" by Republic Bank is immediately repaid to it by NetCredit, who then acquires "servicing" rights and becomes an assignee of the loan.

54.      The capital to fund the loans is provided by NetCredit, Enova, or another of its subsidiaries.

55.     NetCredit also assumes the risk of bad debt concerning its loans, meaning that NetCredit's capital, and not Republic Bank's, is at risk.

56.     Additionally, Republic Bank's economic interests are protected due to agreements that NetCredit maintains cash collateral in a Republic Bank account.

57.     NetCredit also acts as the servicer for loans and extensions of credit made through NetCredit.com.

58.     NetCredit reconciles the accounts, posts payments and other credits to the accounts, and provides periodic billing statements to consumers.

59.     As per the NetCredit business model, once Republic Bank "made" an extension of credit to a consumer, the Account (or the rights to the receivables contained within the Account) was immediately assigned to NetCredit.

60.     In sum, NetCredit, and not Republic Bank, is the true lender of Plaintiff's loan, because it has the predominant economic interest in loans made to consumers like her.  *Ubaldi v. SLM Corp.*, 852 F.Supp.2d 1190 (N.D.Cal. 2012); *Eul v. Transworld Sys.*, 15cv7755, 2017 U.S. Dist. LEXIS 47505, at \*22-23, 2017 WL 1178537 (N.D. Ill. Mar. 30, 2017); *Eastern v. American West Financial,* 381 F.3d 948, 957 (9th Cir. 2004);  *CashCall, Inc. v. Morrisey*, 2014 W. Va. LEXIS 587, 2014 WL 2404300, at \*14 (W.Va. May 30, 2014); *People ex rel. Spitzer v. Cty. Bank of Rehoboth Beach, Del.*, 45 A.D.3d 1136, 846 N.Y.S.2d 436, 439 (N.Y. App. Div. 2007); *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 15cv7522, 2016 U.S. Dist. LEXIS 130584, at \*16, 2016 WL 4820635 (C.D. Cal. Aug. 31, 2016); *BankWest Inc. v. Oxendine*, 266 Ga.App. 771, 598 S.E.2d 343  (2004); *BankWest, Inc. v. Baker*, 324 F.Supp.2d 1333 (N.D.Ga. 2004); *Commonwealth of Pennsylvania v. Think Fin., Inc.,* 14cv7139, 2016 U.S. Dist. LEXIS 4649, at \*40, 2016 WL 161597 (E.D. Pa. Jan. 14, 2016); *Solomon v. American Web Loan*, 4:17cv145, 2019 U.S. Dist. LEXIS 48420, 2019 WL 1320790 (E.D. Va. Mar. 20, 2019); *Meade v. Marlette Funding, LLC,* 17cv30376 and 30377, 2018 Colo. Dist. LEXIS 3856 (Dist. Ct., Aug. 13, 2018), later opinion, 2018 Colo. Dist. LEXIS 4042 (Dist. Ct., Aug. 14, 2018); *State v. CashCall, Inc.*, 27cv13-12740, 2013 Minn. Dist. LEXIS 31 (Hennepin Co., Sept. 6, 2013)*; State ex rel. Cooper v. Western Sky Fin., LLC,* 13cvs16487, 2015 NCBC 84,  2015 NCBC LEXIS 87  (N.C.Super. Ct., Wake Co., Aug. 27, 2015); *Terry v. Community Bank of Northern Virginia,* 255 F.Supp.2d 817, 822 (W.D.Tenn. 2003).

61.     After an account is assigned to NetCredit, it then proceeds to collect usurious

-8-

interest and fees from consumers.

62.     NetCredit Loan Services, LLC thus obtains  the predominant economic interest in the loan, i.e., 95% to 100%.

63.     NetCredit Loan Services, LLC markets, brokers, arranges, and facilitates the loan and has the right to obtain the 95% to 100% interest in the loans.

64.     NetCredit Loan Services, LLC predominantly designs, controls, or operates the loan program, i.e., "deliver[s] the technology and services to the bank partner to facilitate origination and servicing of loans throughout each loan's lifecycle".

65.     NetCredit Loan Services, LLC engaged in "direct origination" of some loans, but "shifted towards the bank partner model" in order to avoid state interest caps, i.e., "because its bank partners operate under federal law, which allows them to lend nationally based on their state domicile."  It thus "purports to act as an agent, service provider, or in another capacity for an exempt entity while acting directly as a lender in other states."

66.     NetCredit Loan Services, LLC pays Republic Bank a small, guaranteed fee for each loan originated.  Republic Bank stands to lose virtually nothing if a loan goes bad and stands to gain practically nothing if a loan is repaid.

67.     Republic Bank has a website that offers its customers personal loans, https://www.republicbank.com/personal/personal-loans-lines-of-credit/, but it does not mention the high-interest loans at issue here.  These can only be obtained through NetCredit Loan Services, LLC, and not through Republic Bank directly.

**EXTENT OF LENDING ACTIVITIES AT ISSUE**

68.     NetCredit Loan Services, LLC had over $900 million in receivables outstanding at the end of 2023.  On information and belief, more than $20 million was owed by Indiana residents.

69.     In an attempt to evade the Indiana Consumer Credit Code, NetCredit Loan Services, LLC's agreements provide for arbitration and require the arbitrator to apply Kentucky law.

70.     Such provision is an impermissible prospective waiver of statutory rights under the

Indiana Uniform Consumer Credit Code, and is invalid.

## INDIANA REGULATION OF LENDING

71.     The Indiana Uniform Consumer Credit Code, Ind. Code § 24-4.5-3-201, establishes

a maximum loan finance charge of 36% per annum for consumer loans other than supervised loans.

72.     For loans other than supervised loans, Ind. Code § 24-4.5-3-201 provides:

(1) Except as provided in subsections (7) and (9), with respect to a consumer loan, other than a supervised loan (as defined in section 501 [IC 24-4.5-3-501] of this chapter), a lender may contract for a loan finance charge, calculated according to the actuarial method, not exceeding twenty-five percent (25%) per year on the unpaid balances of the principal (as defined in section 107(3) [IC 24-4.5-3-107(3)] of this chapter). . . .

73.     With respect to supervised loans, the Indiana Uniform Consumer Credit Code, Ind.

Code § 24-4.5-3-508, provides:

Loan finance charge for supervised loans.

(1) With respect to a supervised loan, including a loan pursuant to a revolving loan account, a supervised lender may contract for and receive a loan finance charge not exceeding that permitted by this section.

(2) The loan finance charge, calculated according to the actuarial method, may not exceed the equivalent of the greater of:

    (a) the total of:

        (i) thirty-six percent (36%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) [IC 24-4.5-3-107(3)] of this chapter) which is two thousand dollars ($2,000) or less;

        (ii) twenty-one percent (21%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) of this chapter) which is more than two thousand dollars ($2,000) but does not exceed four thousand dollars ($4,000); and

        (iii) fifteen percent (15%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) of this chapter) which is more than four thousand dollars ($4,000); or

    (b) twenty-five percent (25%) per year on the unpaid balances of the principal (as defined in section 107(3) of this chapter). . . .

74.     There is also a provision for small loans, Ind. Code § 24-4.5-7-101 *et seq.*, but it

requires that small loans conform to other requirements that Defendants' loans do not comply with.

75.     Ind. Code. § 24-4.5-7-201, "Limitations on finance charges," provides:

(1) Finance charges on the first two hundred fifty dollars ($250) of a small loan are limited to fifteen percent (15%) of the principal.

(2) Finance charges on the amount of a small loan greater than two hundred fifty dollars ($250) and less than or equal to four hundred dollars ($400) are limited to thirteen percent (13%) of the amount over two hundred fifty dollars ($250) and less than or equal to four hundred dollars ($400).

(3) Finance charges on the amount of the small loan greater than four hundred dollars ($400) and less than or equal to five hundred fifty dollars ($550) are limited to ten percent (10%) of the amount over four hundred dollars ($400) and less than or equal to five hundred fifty dollars ($550).

(4) The amount of five hundred fifty dollars ($550) in subsection (3) is subject to change under the provisions on adjustment of dollar amounts (IC 24-4.5-1-106). However, notwithstanding IC 24-4.5-1-106(1), the Reference Base Index to be used under this subsection is the Index for October 2006.

76.     The amount of finance charge provided for in <u>Exhibit A</u> exceeds that permitted in Indiana under any provision.

77.     Ind. Code Ann. § 24-4.5-1-201, "Territorial application," provides:

(1) Except as otherwise provided in this section, this article applies to sales, leases, and loans made in this state and to modifications, including refinancings, consolidations, and deferrals, made in this state, of sales, leases, and loans, wherever made. For purposes of this article, the following apply: . . .

> (c) A loan or modification of a loan agreement is made in this state if a writing signed by the debtor and evidencing the debt is received by the lender or a person acting on behalf of the lender in this state.

> (d) Except as provided in subdivisions (e) and (f), a sale, lease, or loan transaction occurs in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction with a creditor or a person acting on behalf of the creditor in another state and the creditor or the person acting on behalf of the creditor has advertised or solicited sales, leases, or loans in Indiana by any means, including by mail, brochure, telephone, print, radio, television, the Internet, or electronic means.

> (e) A sale, lease, or loan transaction does not occur in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction secured by an interest in land located outside Indiana.

> (f) A sale, lease, or loan transaction does not occur in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction at a creditor's place of business in another state.

For purposes of subdivisions (a) through (c), an offer is received by a creditor or a person acting on behalf of the creditor in Indiana if the offer is physically delivered, or otherwise transmitted or communicated, to a person who has actual or apparent authority to act for

the creditor or the person acting on behalf of the creditor in Indiana, regardless of whether approval, acceptance, or ratification by any other agent or representative of the creditor or the person acting on behalf of the creditor in another state is necessary to give legal consequence to the consumer credit transaction. . . .

(5) Notwithstanding other provisions of this section:

> (a) except as provided in subsection (2), this article does not apply if the buyer, lessee, or debtor is not a resident of this state at the time of a credit transaction and the parties then agree that the law of the buyer's, lessee's, or debtor's residence applies; and

> (b) this article applies if the buyer, lessee, or debtor is a resident of this state at the time of a credit transaction and the parties then agree that the law of this state applies.

(6) Except as provided in subsection (5), the following agreements by a buyer, lessee, or debtor are invalid with respect to consumer credit sales, consumer leases, consumer loans, or modifications thereof, to which this article applies:

> (a) An agreement that the law of another state shall apply.

> (b) An agreement that the buyer, lessee, or debtor consents to the jurisdiction of another state.

> (c) An agreement that fixes venue. . . .

(8) If a creditor or a person acting on behalf of the creditor has violated the provisions of this article that apply to the authority to make consumer loans (IC 24-4.5-3-502), the loan is void and the debtor is not obligated to pay either the principal or loan finance charge, as set forth in IC 24-4.5-5-202.

78.     Ind. Code 24-4.5-1-107 prohibits waiver by the consumer of rights under the

Uniform Consumer Credit Code:

> Waiver — Agreement to forego rights — Settlement of claims.

> (1)     Except as otherwise provided in this Article, a buyer, lessee, or debtor may not waive or agree to forego rights or benefits under this Article.

> (2)     A claim by a buyer, lessee, or debtor against a creditor for an excess charge, other violation of this Article, or civil penalty, or a claim against a buyer, lessee, or debtor for default or breach of a duty imposed by this Article, if disputed in good faith, may be settled by agreement.

> (3)     A claim, whether or not disputed against a buyer, lessee or debtor may be settled for less value than the amount claimed.

> (4)     A settlement in which the buyer, lessee, or debtor waives or agrees to forego rights or benefits under this Article is invalid if the court as a matter of law finds the

settlement to have been unconscionable at the time it was made. The competence of the buyer, lessee, or debtor, any deception or coercion practiced upon him, the nature and extent of the legal advice received by him, and the value of the consideration are relevant to the issue of unconscionability.

79.     Ind. Code § 24-4.5-5-202, "Effect of violations on rights of parties," provides:

. . .  (3) A debtor is not obligated to pay a charge in excess of that allowed by this Article, and **if the debtor has paid an excess charge the debtor has a right to a refund**. A refund may be made by reducing the debtor's obligation by the amount of the excess charge. If the debtor has paid an amount in excess of the lawful obligation under the agreement, the debtor may recover the excess amount from the person who made the excess charge or from an assignee of that person's rights who undertakes direct collection of payments from or enforcement of rights against debtors arising from the debt.

(4) **If a debtor is entitled to a refund and a person liable to the debtor refuses to make a refund within a reasonable time after demand, the debtor may recover from that person a penalty in an amount determined by a court not exceeding the greater of either the amount of the credit service or loan finance charge or ten (10) times the amount of the excess charge. If the creditor has made an excess charge in deliberate violation of or in reckless disregard for this Article, the penalty may be recovered even though the creditor has refunded the excess charge.** No penalty pursuant to this subsection may be recovered if a court has ordered a similar penalty assessed against the same person in a civil action by the department (IC 24-4.5-6-113). With respect to excess charges arising from sales made pursuant to revolving charge accounts or from loans made pursuant to revolving loan accounts, no action pursuant to this subsection may be brought more than two (2) years after the time the excess charge was made. With respect to excess charges arising from other consumer credit sales or consumer loans, no action pursuant to this subsection may be brought more than one (1) year after the due date of the last scheduled payment of the agreement pursuant to which the charge was made. . . .

(7) If the creditor establishes by a preponderance of evidence that a violation is unintentional or the result of a bona fide error, no liability is imposed under subsections (1), (2), and (4) and the validity of the transaction is not affected.

(8) In any case in which it is found that a creditor has violated this Article, the court may award **reasonable attorney's fees** incurred by the debtor. . . . (Emphasis added)

80.     The excessive interest charges imposed by Defendant were willful.  Enova's 10-K states (original page 26) that ". . . There have also been numerous litigation and enforcement actions that challenge the status of the issuing bank partner as the "true lender" of the loan in question. . . . If we were deemed by a court to be the 'true lender' of any loans originated by the issuing bank partner, it could impact the enforceability of the loans; it could subject us to regulatory investigations, penalties and fines; we might have to alter the terms of the loans we broker; it could create challenges for our capital markets and securitization models; we would have to change the

-13-

way we do business in such jurisdictions; and we may suffer an adverse impact on our business." Defendant thus undertook what it knew to be a course of conduct that presented substantial risk of illegality.

81.     Loans to Indiana residents made in the same manner as the loan to Plaintiff is governed by the laws of the State of Indiana.

## COUNT I – INDIANA UNIFORM CONSUMER CREDIT CODE

82.     Plaintiff incorporates paragraphs 1-81.

83.     Because the loan made to Plaintiff violated the rate limits set by Indiana law, and the violation was intentional, Plaintiff and other borrowers are entitled to ten (10) times the amount of the excess charge.

## CLASS ALLEGATIONS

84.     Plaintiff brings this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

85.     The class consists of (a) all individuals with Indiana addresses (b) for whom a loan was arranged by NetCredit at more than 36% interest (c) on or after a date two years prior to the filing of this action.

86.     Plaintiff may alter the class definition to conform to developments in the case and discovery.

87.     The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least forty class members.

88.     There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

89.     Plaintiff will fairly and adequately represent the class members. Plaintiff has

retained counsel experienced in class actions and consumer credit litigation.

90.     Plaintiff's claims are typical of the claims of the class members. All are based on the same factual and legal theories.

91.     A class action is superior for the fair and efficient adjudication of this matter, in that:

      a.     Individual actions are not economically feasible.

      b.     Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

      i.     Statutory damages;

      ii.     Attorney's fees, expenses and costs; and

      iii.     Such other or further relief as is appropriate.


*/s/ Daniel A. Edelman*
Daniel A. Edelman

Daniel A. Edelman
Keelan D. Kane
**EDELMAN, COMBS, LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1800
Chicago, IL 60603-1841
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service: courtecl@edcombs.com

## JURY DEMAND

Plaintiff demands trial by jury.


*/s/ Daniel A. Edelman*
Daniel A. Edelman

## NOTICE OF LIEN AND ASSIGNMENT

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards. All rights relating to attorney's fees have been assigned to counsel.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

## <u>DOCUMENT PRESERVATION DEMAND</u>

Each Plaintiff hereby demands that each Defendant take affirmative steps to preserve all recordings, data, documents, and all other tangible things that relate to Plaintiff, class members, the events described herein, any third party associated with any telephone call, campaign, account, sale or file associated with Plaintiff, and any account or number or symbol relating to them. These materials are likely very relevant to the litigation of this claim. If any Defendant is aware of any third party that has possession, custody, or control of any such materials, Plaintiff demands that Defendant request that such third party also take steps to preserve the materials. This demand shall not narrow the scope of any independent document preservation duties of the Defendant.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

-17-